**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Mar 31, 2014

| | |
|---|---|
| IN RE: | |
| **GEORGE DAVID GORDON, JR.,** | **Case No. 11-10045-M** |
| Debtor. | **Chapter 7** |
| **RICHARD A. WIELAND, UNITED STATES TRUSTEE,** | |
| Plaintiff, | |
| v. | **Adv. Proc. No. 11-01113-M** |
| **GEORGE DAVID GORDON, JR.,** | |
| Defendant. | |

### MEMORANDUM OPINION

It's a story as old as debt itself.  A breadwinner places assets in the name of a spouse or third-party in an effort to "protect the family."  All is well until creditors come knocking, which they inevitably do, and find themselves ensnared in a knot of legal entanglements regarding ownership of the debtor's assets.  While such machinations may not be criminal, if they are designed to hinder or delay creditors the result may be the loss of a discharge in bankruptcy.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52.

### Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b).[1]  Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C. § 157(a).  The

---

[1]  Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

granting or denial of a discharge is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(J).

## Findings of Fact

### *Admitted Facts*

These facts were stipulated by the parties in the Pretrial Order.[2] The Pretrial Order contained 123 separately numbered stipulations of fact. The Court includes only those facts necessary to reach its decision herein. The stipulated facts have been renumbered and edited by the Court where necessary to provide clarity to the reader. All relevance objections by the Defendant regarding these stipulated facts are hereby overruled.

1. On January 7, 2011, George David Gordon, Jr. ("Defendant" or "Gordon") filed a voluntary Chapter 7 petition, schedules, statement of financial affairs ("SOFA"), and other miscellaneous statements. Defendant signed his declarations under penalty of perjury in the petition, Declaration Concerning Debtor's Schedules, and the SOFA. Defendant indicated that his debts were primarily business debts. Defendant signed the documents over several days prior to the date of filing, and filed a statement verifying the documents were valid and there was no material change in circumstances that had occurred in the interim.

2. Defendant filed three amendments to his schedules and statements in this case on January 18, 2011, June 13, 2011, and December 1, 2011.

3. The U.S. Trustee ("Plaintiff") appointed Patrick J. Malloy, III ("Trustee") as the Chapter 7 trustee in Defendant's case. He continues to serve in that capacity.

4. The first meeting of creditors was held on February 16, 2011. Defendant appeared telephonically, testifying under oath that he signed the petition, schedules of assets and

---

[2] *Docket No. 43.*

liabilities, and SOFA, and that he had reviewed them and they were true and correct at the time.

5.      At the meeting of creditors, Defendant testified he had a couple of changes to make to his schedules and statements.  The changes involved omitted or undervalued assets, accounts, and business interests.[3]

6.      Defendant is presently incarcerated in a federal correctional facility in Texarkana, Texas.  He was convicted of conspiracy to commit securities fraud, wire fraud, and money laundering by the United States District Court for the Northern District of Oklahoma (the "District Court").  His crime has been described as a "pump and dump" stock scheme (or series of schemes).[4]

7.      Amy Gordon ("Mrs. Gordon") is the Defendant's wife, and they lived together at all relevant times until his incarceration.  At her request, the automatic stay provided by § 362 has been terminated for her to proceed with the dissolution of their marriage.

8.      Defendant was formerly licensed as a CPA and an Oklahoma attorney.  His undergraduate degree is from Baylor University.  He received his Juris Doctorate degree in 1988 from the University of Tulsa.

9.      Defendant was the sole owner of a professional corporation, namely: G. David Gordon &

---

[3]  *See also* Pl.'s Ex. 10, *Transcript of 341 Meeting of Creditors*.

[4]  Although this was not an admitted fact, it is taken directly from a Memorandum Opinion issued by this Court in Defendant's bankruptcy case, Case No. 11-10045-M, *at Docket No. 331*.  The Court feels it is necessary to an understanding of the later recited facts.  As the Court understands it, a "pump and dump" stock scheme involves the inflation of stock prices on the basis of false or fraudulent information (the "pump"), followed by the sale of that stock to unsuspecting investors (the "dump").  The result is that the parties selling the near worthless stock reap huge profits, and the unwitting investors are duped out of large sums of money.

Associates, P.C.  His company was incorporated to provide legal services.

10.     In his deposition dated November 2, 2012, Defendant characterized his business as his law firm and his principal occupation as the practice of law.  In addition, Defendant did some accounting work, approximately $600 a month that did not run through the law firm.  He also did personal investing in companies.

11.     In November 2001, Defendant filed a Complaint for Injunctive Relief in the District Court, Case No. 01-CV-0858C, against the United States Securities and Exchange Commission, seeking a temporary restraining order, preliminary injunction, and permanent injunction prohibiting the SEC from issuing and/or enforcing a subpoena duces tecum for the production of records by Bank of America relating to the G. David Gordon & Associates, P.C. Trust account.  Defendant subsequently voluntarily dismissed the action.

12.     In July 2007, Tim J. Tylicki, Special Agent for the Federal Bureau of Investigation, filed an Application and Affidavit for Search Warrant in the District Court, to search and seize records from the location where Defendant conducted business.

13.     In January 2009, in *United States vs. George David Gordon, et al.*, 09-CR-13 GKF ("the Government Case") filed in the District Court, Gordon was charged with conspiracy, wire fraud, aiding and abetting, securities fraud, money laundering, false statements, and obstruction of justice for manipulating share prices of "penny stock" companies by a "pump and dump" scheme through his corporation and other shell companies under his direction and control.

14.     On May 3, 2010, after a jury trial in the Government Case, Defendant was convicted of nine counts of wire fraud, five counts of securities fraud, five counts of money laundering, a wire

fraud scheme, and one count of obstruction of justice.

15.    On October 29, 2010, Defendant was sentenced for his criminal conduct by The Honorable James H. Payne, District Judge for the District Court, who made, in part, the following findings:

    a.    Defendant was convicted of a conspiracy wherein the jury found that Defendant conspired and agreed with others to commit securities fraud and other crimes in the manipulation and sale of stock for Defendant's monetary gain.[5]

    b.    Defendant was responsible for an illegal gain caused by [the stock fraud scheme of 3 specific stocks] of $43,927,809.[6]

    c.    Defendant conceived and perpetrated a scheme to illegally convert [a specific stock's] shares to free-trading shares, then caused the sale of the stock resulting in the receipt of $2,714,504. The Defendant caused the transfer of $2,172,604 of the proceeds to his control enabling him to pay off his home mortgage.[7]

16.    Defendant was incarcerated upon his conviction in May 2010. He has remained incarcerated since that time. His business office was closed in May 2010, and all records and assets of the law firm of G. David Gordon & Associates, P.C. and all personal business files of Defendant were moved under the direction of Mrs. Gordon and Susan Willis, Defendant's paralegal, from his place of business to the residence of Mrs. Gordon, as well as other locations.

---

[5] Pl.'s Ex. 51-341:4–8, *Partial Transcript of Sentencing Hearing before The Honorable James H. Payne*, October 29, 2010.

[6] *Id.* at 51-343:9–10.

[7] *Id.* at 51-343:21–25 to -344:1.

17.     On September 15, 2010, Judge Payne entered the following judgment for the United States in the Government Case:  a money judgment against Gordon in the sum of $43,927,809.95; a criminal forfeiture money judgment of $2,747,761.81 representing a traceable wire fraud scheme; forfeiture to the United States of three financial accounts; and forfeiture of Gordon's interest in real property, commonly known as 10726 South Lakewood Avenue, Tulsa, Tulsa County, Oklahoma (the "Residence") to the extent of $1,702,000 that was traceable to a wire fraud scheme, with the remainder of his interest in the Residence forfeited as a substitute asset.[8]

18.     On January 11, 2011, a Second Order for Forfeiture of Certain Assets of Gordon was entered by Judge Payne forfeiting his interests in several corporations, brokerage trading accounts, and other real property.[9]

19.     On February 16, 2011, Judge Payne entered a Final Order of Forfeiture of Real Property and Funds in Financial Accounts, forfeiting to the United States the entirety of the Residence, subject to a settlement regarding the interest of Mrs. Gordon.[10]

20.     In February 2009, in *Securities and Exchange Commission vs. George David Gordon, et al.*, 09-CV-061-CVE (Civil) (the "SEC Case") filed in the District Court, Gordon was alleged to have manipulated share prices of "penny stock" companies by a "pump and dump" scheme from the spring of 2005 through December 2006, and alleged to have derived illegal

---

[8]  *Id.* at 51-305 to -309.

[9]  *Id.* at 51-362 to -365.

[10]  *Id.* at 51-414 to -417.  Both the criminal conviction and forfeiture orders in the Government Case were ultimately affirmed by the United States Court of Appeals for the Tenth Circuit in a published opinion, *United States v. Gordon*, 710 F.3d 1124 (10th Cir. 2013).  *See also* Pl.'s Ex. 51-434.

trading profits totaling in excess of $20 million.

21.     In November 2011, a money judgment for disgorgement was awarded in the SEC Case in the amount of $40,072,806.97, representing profits from the sale of said penny stocks including interest of $10,307,489.92 from January 1, 2007 through December 31, 2010, with interest accruing at .10 percent [sic] per annum.  Defendant was also permanently barred from participating in an offering of any penny stock, including engaging in activities with a broker dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

22.     Defendant and Mrs. Gordon sold stock in 2000 that resulted in a capital gain for that year of almost $20,000,000 (the "2000 Capital Gain").  The Gordons' joint federal income tax returns show stock sales and gains or losses on stock sales as follows:

| Year | $ Sales | $ Gain/Loss |
|---|---|---|
| 2000 | $39,273,310 | $19,607,141 |
| 2001 | 19,846,872 | (89,803) |
| 2002 | 756,911 | 17,627 |
| 2003 | Not Available | Not Available |
| 2004 | 3,124,593 | (244,487) |
| 2005 | 1,418,638 | (1,230,188) |
| 2006 | 2,073,657 | (512,276) |
| 2007 | 838,848 | 220,863 |
| 2008 | 3,067 | (82) |
| 2009 | 55,390 | (13,813) |
| 2010 | 64,984 | (34,606) |
| Totals | $67,456,270 | $17,720,376 |

23.    On September 6, 2010, Defendant executed a Durable Power of Attorney giving Mrs. Gordon certain powers to act on Defendant's behalf.

24.    The Trustee recovered $300,000 through settlement of a fraudulent conveyance claim from Mrs. Gordon in connection with transfers of property.

25.    After Ron Brown entered the case as Defendant's counsel, Ron Brown provided documents from Defendant's books and records to the Trustee and the Plaintiff that were in the possession of Mrs. Gordon.

***Additional Facts***

*The Residence*

The Gordons acquired real property located at 10726 S. Lakewood, Tulsa, Oklahoma the same year they reported the 2000 Capital Gain. The real property was transferred by general warranty deed, dated December 18, 2000, from Sheridan 108, L.L.C. to Mrs. Gordon.[11]  No mortgage was recorded on the property at that time. In early 2003, a construction mortgage was acquired in the name of Mrs. Gordon in order to build the Residence.[12]  The mortgage was amended later that year to include both of the Gordons as borrowers. A loan checklist identifies both of the Gordons as borrowers, and they both executed the Promissory Note for the loan. The loan agreement documents reflect only Defendant's social security number. The loan was renewed until a final payment of $1,702,000 was made in November 2005 from the sale of Mrs. Gordon's stock.[13]

---

[11]  *See* Def.'s Ex. 213.

[12]  *See* Pl.'s Ex. 51-287 to -289, *Affidavit of William Robert Taylor*.

[13]  *Id.*  This payment, made by a wire transfer by one of Defendant's colleagues from the proceeds of a stock sale, was the subject of a count in the Government Case that ultimately resulted in the direct forfeiture of $1,702,000 from proceeds of the sale of the Residence. *See also* Pl.'s Ex. 122, vol. 2, at 302:4–7.

When asked why the loan was repaid, Defendant stated that the difference between the mortgage interest rate of 6 or 7 percent, and the available return on a certificate of deposit, then at 1 or 1.5 percent, made it an easy decision.[14]

Defendant testified that in 2003, $5,400,000 of the 2000 Capital Gain was spent to build the Residence.[15]  Despite the fact that this money came from the 2000 Capital Gain, Defendant is adamant that the Residence was built only with Mrs. Gordon's money.[16]  Legal title to the Residence was placed in the name of Mrs. Gordon; it was not titled as a jointly owned asset.  When asked to explain why, the following exchange occurred between Plaintiff and Defendant:

Q [by Katharine Vance, Assistant United States Trustee]: Why was the house owned only in the name of Amy Gordon?

A [by Defendant]: Because it was built with her money.

Q: What happened to your share of the money that was in the other house?

A: That went for some furniture and some – probably the tennis court.  But basically the – we agreed or I agreed that the house was hers back in 2000.

Q: And why would you-all make an agreement like that?

A: Why would I make an agreement like that?

Q: Yes.

A: One, to let her know – at that point in time I was doing a lot of traveling, probably out of

---

14  Pl.'s Ex. 122, vol. 2, at 302:4–12.  Defendant testified in this proceeding by way of a telephonic deposition, taken on August 13, 2013, and September 19, 2013.

15  *Id.* at 286:3–20.  *See also* Def.'s Ex. 215.

16  Pl.'s Ex. 122, vol. 2, at 273:16–24.  No records regarding the money spent to build the Residence were provided to the Court.

the house two weeks a month.  And – and just to let her know that I had no intentions on

leaving her or anything else is one.  And that was – that was the one big issue that I wanted

to make sure she realized.  And so I put the house in her name.  Probably, I guess, out of love

more than anything else.  Just to prove my love, I guess, really is what it was.

Q: And what's the status of your marriage?

A: We're still married.[17]

Defendant also testified that approximately $50,000 of the 2000 Capital Gain went towards real

estate taxes each year from 2003 to 2010.[18]  Defendant testified that at the time he was incarcerated,

many of the utilities for the Residence were in his name.[19]  This necessitated him to sign a durable

power of attorney for Mrs. Gordon to allow her to transfer those utilities after the forfeiture orders

were entered.  Defendant never executed a Quit Claim Deed conveying his interest in the Residence

to Mrs. Gordon.

　　　Prior to and throughout these proceedings, Defendant has disavowed any interest, whether

legal, marital, or equitable, in the Residence.[20]  In November 2006, Defendant filled out a personal

financial statement as an individual, listing the Residence among his assets, valued at $4,500,000,

noting that title was held in the name of Mrs. Gordon.[21]  In May 2009, Defendant submitted a

personal financial statement to Commerce Bank, wherein he listed the Residence, with a market

---

[17] *Id.* at 273:16 – 274:15.

[18] *Id.* at 286:21–24.  *See also* Def.'s Ex. 215.

[19] Pl.'s Ex. 122, vol. 1, at 161:15–25.

[20] *See, e.g.*, *id.* at 166:7–9.

[21] Pl.'s Ex. 20-5 to -8.

value of $4,000,000, among his assets, but named Mrs. Gordon as the legal owner.[22]  In a letter dated March 11, 2009, Defendant represented to the U.S. Probation Office, in connection with the Government Case, that he held no interest in real estate.[23]   On November 30, 2010, also in connection with the Government Case, Defendant filed a declaration in support of an In Forma Pauperis motion with the District Court, where Defendant valued the Residence at $4,000,000.  In that document, he included a notation that the Residence was his "wife's separate property."[24]

In his original bankruptcy petition, on Schedule A, Defendant stated that "Debtor does not own interests in any real estate but the federal government has erroneously obtained a forfeiture judgment against his wife's home at 10726 S. Lakewood, Tulsa, OK" and listed a "secured* claim" in the amount of $1,702,000 with the explanatory notation that "*Debtor is unsure whether the government's Forfeiture Order is a secured claim for bankruptcy purposes but includes it in the interest of full disclosure."[25]  In an amendment to his schedules filed in December 2011, he removed the secured amount, and added a comment: "Further, debtor states that the home was titled in the debtor's wife's name. To the extent that the debtor could claim an equitable ownership in the home, any such interest was taken by forfeiture in the debtor's federal criminal law case."[26]

When asked whether he held a marital interest in the Residence, Defendant answered that he had no interest in the Residence because it was forfeited to the United States by an order in the

---

[22]  *Id.* at 20-1 to -4.

[23]  *See* Pl.'s Ex. 52-28.

[24]  *Id.* at 52-16.

[25]  Pl.'s Ex. 6-16.

[26]  Pl.'s Ex. 9-1.

Government Case on September 15, 2010.  He stated that under the terms of the forfeiture order, "ownership reverted to the government back in 2005.  So I had no interest in the home after that date."[27]  When asked why he did not disclose a transfer of the Residence in his schedules, he again repeated that "[He] didn't have any ownership of [the Residence] in – going all the way back to 2005."[28]  Despite his denial of any interest in the Residence, when asked why he filed this bankruptcy case, Defendant responded that among the reasons was a hope "that it would prevent the government from basically, you know, taking all of my assets."[29]  He specifically mentioned that the Residence, stock, and cash were among the assets he hoped to protect from the government forfeiture that was underway at the time.[30]

In each of the Gordons' joint tax returns for the years 2000–2010, Mrs. Gordon's occupation is listed as either "homemaker" or "housewife."[31]  Defendant stated that although Mrs. Gordon may have worked outside the home at one time during their marriage, she had not worked outside the home during the last ten years prior to his incarceration.[32]  Early in their marriage, Defendant developed a procedure whereby he would "give" stock and money to Mrs. Gordon to keep in her own name, and he would hold other property in his own name or in the name of his P.C.  Defendant

---

[27]  Pl.'s Ex. 122, vol. 1, at 44:11–21.

[28]  *Id.* at 44:22 – 45:4.

[29]  *Id.* at 65:13–23.

[30]  *Id.* at 65:13 – 66:16.

[31]  *See* Pl.'s Ex. 19; Def.'s Ex. 209.

[32]  Pl.'s Ex. 122, vol. 1, at 47:11–15.  In a declaration filed in support of an In Forma Pauperis motion in connection with the Government Case, Defendant stated that as of November 2010, his wife had not worked in over 16 years.  *See* Pl.'s Ex. 52-15.

testified that through this process of regular transfers, Mrs. Gordon eventually accumulated significant assets in her own name, which Defendant often referred to as "her money."[33]  Through this mechanism, Mrs. Gordon eventually acquired sufficient assets whereby she could make her own stock purchases, but Defendant acknowledged that the initial money in her account came from jointly-acquired assets.  The Residence was among the assets purchased by Mrs. Gordon using "her money" during their marriage.  Defendant testified to his understanding that a marital interest does not form until someone files for divorce, noting that he was not a divorce attorney.  Defendant stated a belief that he had no marital interest in any assets purchased by Mrs. Gordon "with her own separate proceeds of money that was hers."[34]

Despite being held in legal title by Mrs. Gordon, the Court finds as a fact that the Residence has always been treated by both Defendant and his wife as joint property.  From the time of its acquisition until his incarceration, the Gordons lived together and treated the Residence as their mutual home.[35]  Defendant exercised all of the management and control of the Residence that typically corresponds to full ownership.  Most of the utilities were held in his name.  When Defendant submitted personal financial statements to banks in 2006 and 2009, he listed the Residence, stocks, and financial accounts held in Mrs. Gordon's name as assets on which the banks could rely in loaning him money.[36]  The Court finds that Defendant did not live in the Residence at

---

[33]  Pl.'s Ex. 122, vol. 1, at 46:21 – 47:15.

[34]  *Id.* at 46:9–20.

[35]  Although Defendant indicated in his original petition that he was "separated," he later testified that he meant he was physically separated from his wife due to his incarceration.  *See id.* at 42:16–25.

[36]  *See* Pl.'s Ex. 20.

13

Mrs. Gordon's sufferance or under threat of eviction.  Defendant retained *all* of the benefits of ownership—except legal title—which he used to his full advantage when it suited him.

*The Vehicles*

The Gordons' "agreement" regarding title to assets extended to their cars.  Defendant's original petition, as well as each of the three amendments, indicate that he owned no interest in any automobiles.  As of the date of filing the petition, Mrs. Gordon held title to at least two vehicles: a 2007 Lexus GX 470, and a 2007 Acura RDX, which was driven by a son (the "Vehicles").  Defendant testified that prior to his incarceration, he also had a Lexus SUV at his full disposal, separate from his wife's car, but it was titled in her name.[37]  On November 30, 2010, Defendant filed a declaration with the District Court, where he stated that he did not own a vehicle since giving his son a truck in 2005.  Defendant testified that because all of the Vehicles were bought with Mrs. Gordon's "own separate proceeds of money that was hers" he felt he had no interest in any of the cars.[38]

The same analysis applies to the family Vehicles that applied to the Residence.  Despite his public disavowal of any interest in the Residence and the Vehicles, Defendant continued to have joint use, management, and control of those assets—between Defendant and Mrs. Gordon they were always treated as joint property.  The Court finds that despite not holding legal title to either the Residence or the Vehicles, Defendant retained an equitable and beneficial interest in each of those assets from the time they were acquired until the date of the bankruptcy filing.

To the extent the Conclusions of Law contain any items that should more appropriately be

---

[37] *Id.* at 45:5–25.  *See also* Pl.'s Ex. 10-21:17 to -22:22.

[38] Pl.'s Ex. 122, vol. 1, at 46:11–20.

14

considered Findings of Fact, they are incorporated herein by this reference.

## Conclusions of Law

Plaintiff asks the Court to deny Defendant's discharge pursuant to § 727(a)(2)(A), (3), (4)(A), and (5).  Plaintiff argues that Defendant should be denied a discharge under § 727(a)(2)(A) because he purposely concealed his interest in real and personal property—namely, the Residence and the Vehicles—within one year of the date of filing the bankruptcy petition with the intent to hinder, delay, or defraud creditors.  Defendant responds that he had no interest in those properties because they were all legally titled in his wife's name.  Plaintiff makes a similar argument under § 727(a)(4)(A), where he argues that Defendant knowingly and fraudulently made a false oath in this case by failing to disclose his interest in the Residence, Vehicles, and stocks nominally held by the Defendant's wife or his P.C.  Again, Defendant responds that he held no interest to disclose.  Under § 727(a)(3), Plaintiff argues that Defendant did not keep or turn over books and records that would allow the Trustee to ascertain his financial condition or business transactions.  Defendant responds that he turned over everything he had, but he was severely hampered by his incarceration from providing more assistance to the Trustee.  And lastly, Plaintiff argues, under § 727(a)(5), that Defendant has failed to satisfactorily explain what became of the numerous assets he claimed to have only a few years before.  Defendant responds that no one ever asked him to give such an explanation, and that his attempts to provide one have fallen on deaf ears.

### *Burden of Proof*

In order to prevail, Plaintiff must prove each statutory element by a preponderance of the evidence.[39]  Once Plaintiff establishes a *prima facie* case for denying Defendant's discharge under

---

[39]  *See* Fed. R. Bankr. P. 4005.  *See also First Nat'l Bank of Gordon v. Serafini (In re Serafini)*, 938 F.2d 1156, 1157 (10th Cir. 1991); *cf. Grogan v. Garner*, 498 U.S. 279 (1991).

§ 727, the burden of going forward shifts to Defendant.[40]  The ultimate burden, however, remains with Plaintiff.[41]  In order to further the policy of providing a debtor with a "fresh start," "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[42]  Even so, "a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor."[43]

***Section 727(a)(2)(A)***

> Section 727(a)(2)(A) of the Code provides that a discharge may be denied where

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

> (A) property of the debtor, within one year before the date of the filing of the petition[.][44]

This exception to discharge consists of two critical pieces: 1) an act, i.e, a transfer or a concealment, involving property of the debtor; and 2) a subjective intent to hinder, delay, or defraud a creditor.[45]

---

[40]  *See Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984); *Everspring Enters., Inc. v. Wang (In re Wang),* 247 B.R. 211, 214 (Bankr. E.D. Tex. 2000).

[41]  *See First Union Nat'l Bank v. Golob (In re Golob),* 252 B.R. 69, 75 (Bankr. E.D. Va. 2000) (citing *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir. 1994)).

[42]  *Mathai v. Warren (In re Warren),* 512 F.3d 1241, 1248 (10th Cir. 2008) *(*quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1292 (10th Cir. 1997)).

[43]  *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

[44]  § 727(a)(2)(A).

[45]  *Rosen v. Bezner,* 996 F.2d 1527, 1531 (3d Cir. 1993).  *See also In re Warren*, 512 F.3d at 1249 ("[A] party objecting to a discharge under this section 'must show by a preponderance of the evidence that (1) the debtor transferred, removed, concealed, destroyed, or mutilated, (2) property of the estate, (3) within one year prior to the bankruptcy filing, (4) with the intent to hinder, delay, or defraud a creditor.'" (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d

16

Both the act and the intent must be present during the one year before the petition date.  "Anything occurring before that one year period is forgiven."[46]

The bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[47]  Where a transfer of legal title occurred more than one year prior to a bankruptcy filing, but a debtor retained a secret interest in the transferred property, courts have applied the doctrine of continuing concealment.[48]  "This doctrine does not negate the 'act' requirement of § 727 but merely recognizes that a failure to reveal property previously concealed can, in some circumstances, properly be considered culpable conduct during the year before bankruptcy warranting a denial of discharge."[49]  The focus is not on the transfer itself, but on whether the debtor has retained a secret interest in property that remains concealed during the critical period with the requisite improper intent.[50]  Courts have consistently found that the concealment of a secret beneficial interest in property that continues into the year before bankruptcy is within the reach of § 727(a)(2)(A).[51]  As stated by the United States Court of Appeals for the

---

1290, 1292 (10th Cir. 1997))).

[46]  *Rosen*, 996 F.2d at 1531.

[47]  § 541(a)(1).

[48]  *See, e.g., Garland v. United States (In re Garland)*, 385 B.R. 280 (Bankr. E.D. Okla. 2008), *aff'd sub nom. U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805 (10th Cir. BAP 2009).

[49]  *Rosen,* 996 F.2d at 1531.

[50]  *Id.*  (There are "two critical elements necessary to support application of the doctrine, namely, that [the debtor] had a property interest to 'conceal' and, that his concealment of this interest, if it existed during the year before bankruptcy, was motivated by an improper intent.").

[51]  *U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805, 816 (10th Cir. BAP 2009) ("[B]ankruptcy courts have determined that, despite an unqualified transfer of legal title, debtors

Third Circuit,

> In a situation involving a transfer of title coupled with retention of the benefits of ownership, there may, indeed, be a concealment of property. Where this is the case, however, the concealment is present not because retention of the benefits of ownership conceals the fact that the debtor no longer has legal title, but rather because the transfer of title represents to the world that the debtor has transferred away all his interest in the property while in reality he has retained some secret interest—a secret interest of which retention of the benefits of ownership may be evidence. A legally relevant concealment can exist, however, only if there is, in fact, some secret interest in the property retained by the debtor.[52]

In addition to finding that a debtor retained a secret interest in property that was concealed

---

who retain beneficial use of the property and treat it as their own continue to hold a beneficial interest that must be disclosed."), *aff'g* 385 B.R. 280 (Bankr. E.D. Okla. 2008); *Coady v. D.A.N. Joint Venture III, L.P. (In re Coady)*, 588 F.3d 1312, 1316 (11th Cir. 2009) ("The doctrine of continuing concealment provides for situations like this, in which a debtor has kept his assets out of a creditor's reach during the look-back period by means of a sham ownership arrangement established more than one year before the bankruptcy petition was filed."); *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997) ("Under the 'continuing concealment' doctrine, a transfer made and recorded more than one year prior to filing may serve as evidence of the requisite act of concealment where the debtor retains a secret benefit of ownership in the transferred property within the year prior to filing."); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 684 (6th Cir. 2000) (same); *Rosen v. Bezner*, 996 F.2d at 1531 ("Under the 'continuous concealment' doctrine, a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year."); *Thibodeaux v. Olivier ( In re Olivier)*, 819 F.2d 550, 553 (5th Cir. 1987) ("Concealing property for purposes of section 727(a)(2)(A) can be accomplished by a transfer of title coupled with the retention of the benefits of ownership."); *Friedell v. Kauffman (In re Kauffman)*, 675 F.2d 127, 128 (7th Cir. 1981) ("The transfer of title with attendant circumstances indicating that the bankrupt continues to use the property as his own is sufficient to constitute a concealment."); *Korte v. United States (In re Korte)*, 262 B.R. 464, 472 (8th Cir. BAP 2001) ("Relevant to this case, concealment is a continuing event and under the established doctrine of 'continuing concealment,' a concealment that originated outside the one year limitation period is within the reach of § 727(a)(2)(A) if the concealment continued on into the year preceding the filing coupled with the requisite intent. . . . Asset concealment is typically found to exist where the interest of the debtor in property is not apparent but where actual or beneficial enjoyment of that property continued.") (internal citations omitted); *R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253 (1st Cir. BAP 1999) (same).

[52] *Rosen,* 996 F.2d at 1532.

during the one-year period immediately preceding bankruptcy, a court must also find that such concealment was done with the actual intent to hinder, delay, or defraud a creditor during the same period.  "To deny a discharge under § 727(a)(2), a court must find *actual* intent to defraud creditors. Because rare is the occasion when a party lays bare his or her subjective intent, fraudulent intent . . . may be established by circumstantial evidence, or by inferences drawn from a course of conduct."[53]   Among the badges or indicia from which a court may infer fraudulent intent are "situations in which a debtor conceals prebankruptcy conversions; converts assets immediately before the filing of the bankruptcy petition; gratuitously transfers property; continues to use transferred property; and transfers property to family members."[54]   The Court of Appeals for the Tenth Circuit has stated that "the inference of fraudulent behavior flowing from a concealment is greater than from a transfer[.]"[55]   The monetary value of the assets converted is also a factor in determining whether the debtor acted with fraudulent intent.[56]   Where a debtor is found to possess the requisite intent to defraud under § 727(a)(2), "[d]etriment to a creditor need not be shown in order to establish fraudulent concealment or a false oath barring discharge."[57]

To hear the Defendant tell it, there is no "jointly-acquired property" in his household.  There was no evidence presented that either of the Gordons brought any significant assets into their marriage.  Under Oklahoma law, "[j]ointly-acquired property is that which is accumulated by the

---

[53] *Mathai v. Warren (In re Warren)*, 512 F.3d 1241, 1249 (10th Cir. 2008).  *See also Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

[54] *In re Carey*, 938 F.2d 1073, 1077 (10th Cir. 1991) (citations omitted).

[55] *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 n.1 (10th Cir. 1997).

[56] *In re Carey*, 938 F.2d at 1077.

[57] *Strunk*, 671 F.2d at 396.

19

joint industry of the spouses during the marriage," and "[p]roperty acquired during the marriage is presumed to have been jointly acquired."[58]  When asked where Mrs. Gordon got money to acquire assets such as the Residence, Vehicles, and stock, Defendant stated that as he acquired stock through his business ventures, he would give her separate stock to place in her own brokerage account. Through this mechanism, Defendant was effectively making a transfer of his legal interest in those assets to Mrs. Gordon.[59]

When the Gordons purchased the land used for the Residence in 2000 and placed title to the land in Mrs. Gordon's name, Defendant was effectively making a transfer of his legal interest in the property to her.  The same occurred when they spent $5.4 million of "her money" in 2003 to build the Residence, in which she also held legal title.  Defendant testified that this was done pursuant to an agreement that the land and the Residence would be "hers."[60]  When asked why he agreed to such an arrangement, Defendant testified that it was done "just to prove my love" and "just to let her know that I had no intentions on leaving her or anything else[.]"[61]  The construction loan that was acquired to build the Residence listed both of the Gordons as borrowers.  In addition, they both executed the Promissory Note for the loan, although the loan agreement documents reflect only

---

[58]  *Standefer v. Standefer*, 26 P.3d 104, 108 (Okla. 2001). Courts look to state law to create and define property interests of a debtor; they look to federal bankruptcy law to determine the extent to which those interests are property of the estate. *Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir. 2008) (quoting *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1197 (10th Cir. 2002)).

[59]  Oklahoma law allows "a spouse to convey his or her interest in property to the other and alter the legal relationship as to the property."  *See Manhart v. Manhart*, 725 P.2d 1234, 1240 (Okla. 1986) (citing predecessor statutes to 43 O.S. 2001 §§204 and 205).

[60]  Pl.'s Ex. 122, vol. 2, at 273:16–24.

[61]  *Id.* at 274:2–13.

Defendant's social security number.

Defendant has consistently denied that he ever held any interest in the Residence or the Vehicles. The deed to the land holding the Residence is in the name of Mrs. Gordon only, representing to all the world that Defendant has no interest in the property. When he submitted personal financial statements to banks in 2006 and 2009, he was careful to indicate that his wife held legal title to certain property, including the Residence. In a letter dated March 11, 2009, Defendant represented to the U.S. Probation Office, in conjunction with the Government Case, that he held no interest in real estate.[62] In a pleading dated November 30, 2010 (a date that is within one year of the date of filing his bankruptcy case), Defendant represented that the Residence was his "wife's separate property," and that he did not own a vehicle since giving his son a truck in 2005. In his original petition, Defendant stated that he did not own interests in any real estate, and referred to the Residence as his "wife's home." In the final installment of Defendant's amendments to his petition, he adds that "[t]o the extent that the debtor could claim an equitable ownership in the home, any such interest was taken by forfeiture in the debtor's federal criminal law case." This amendment was made *after* this adversary proceeding was filed. To the extent this can be seen as an acknowledgment of his equitable interest in the Residence, the Court finds it to be too little, too late. Defendant actively concealed his equitable interest in the Residence and Vehicles within one year before the date of the filing of his bankruptcy petition.

Lastly, the Plaintiff has the burden to show that Defendant's concealment of his equitable interest in the Residence and Vehicles was done with the intent to hinder, delay, or defraud a creditor within one year of the bankruptcy. The Court finds several badges of fraud in Defendant's

---

[62] *See* Pl.'s Ex. 52-28.

conduct in the year prior to the filing of his bankruptcy case; among them: the concealment of his true equitable and beneficial interest in the Residence and Vehicles and his continued use and enjoyment of the Residence and Vehicles.[63]   During the year prior to bankruptcy, Defendant's criminal proceedings resulted in his incarceration as well as orders of criminal forfeiture involving the Residence and other assets.  Defendant admitted that one of the reasons he filed this bankruptcy was a hope that it would prevent the government from taking all of his assets, namely the Residence and cash.   Defendant's on-going and active concealment of his interest in the Residence and Vehicles, made in representations to both the District Court and this Court, were clearly intended to hinder and delay the United States in its effort to collect assets to repay victims of Gordon's criminal activities as well as the Trustee in his effort to repay Defendant's creditors.   The fact that Defendant's scheme  was ultimately unsuccessful is irrelevant.[64]

Defendant posits that even if he held some remaining interest in the Residence after the transfer of his legal interest to his wife, his interest in the Residence was forfeited to the United States in September 2010.  Therefore, he contends that the Residence never became property of his estate, rendering disclosure of his interest in the Residence unnecessary.  But § 727(a)(2)(A) applies

---

[63]   *See Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997) ("There is little question that if an individual transfers *title* of an item but continues to exercise dominion over it, that fraud could be inferred."); *United States v. Garland (In re Garland)*, 385 B.R. 280 (Bankr. E.D. Okla. 2008), *aff'd*, 417 B.R. 805 (10th Cir. BAP 2009) (finding debtor had equitable or beneficial interest in home as evidenced by uninterrupted occupancy and continued enjoyment of home).

[64]   *See Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 396 (10th Cir. 1982); *In re Hayes*, 229 B.R. 253, 261 (1st Cir. BAP 1999) ("We consider that a correct application of § 727(a)(2)(A)' s concealment element must focus on debtor's wrongful conduct, rather than on the extent to which creditors are successfully misled."); *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 569 (7th Cir. 1989) ("The statute does not provide that the creditors must have, in fact, been hindered, delayed or defrauded.").

to the Defendant's actions and intent with regard to property in which he held an interest within one year prior to the petition date. The order of forfeiture of Defendant's interest in the Residence and other property was issued on September 15, 2010, meaning that prior to that date, and well within a year before the petition date, Gordon held an interest in the property that was being concealed.[65]

Defendant argues that he holds no interest in the Residence or Vehicles because he effectively transferred any interest to Mrs. Gordon, making these assets separate instead of "jointly-acquired" property under Oklahoma law. He states a belief that any "marital interest" in the property will only arise when and if divorce proceedings ensue. In divorce proceedings, an Oklahoma state court may, in some circumstances, reclassify previously transferred property as jointly-acquired property.[66] A divorce proceeding is not the only way for a court to find that Defendant held an interest in the Residence and Vehicles. Under Oklahoma law, a state court may reclassify property in accordance with the *actual* interest of the parties in the property, as opposed to their nominal or legal interests.[67] The Court disagrees with Defendant that section 121 of title 43

---

[65] Defendant tries to escape this fact by noting that by statute, the forfeiture order has a retroactive effect back to the date of the crime. Whether or not that is true, it does not change the fact that Defendant engaged in an act with improper intent, with respect to his property at the time, within one year of the date of the bankruptcy petition.

[66] *See* Okla. Stat. tit. 43, § 121; *Manhart v. Manhart*, 725 P.2d 1234, 1239 (Okla. 1986) ("It is well settled in Oklahoma, that one spouse may convey a property interest to the other spouse. Additionally, the text of 32 O.S. § 5 [renumbered as Okla. Stat. tit 43, § 204], allows the alteration of spousal relations concerning property-*i.e.* removal of jointly acquired property subject to equitable division under 12 O.S. § 1278 [renumbered as Okla. Stat. tit 43, § 121], from the marital estate.") (citations omitted); *King v. King*, 212 P.3d 1232, 1235 (Okla. Civ. App. 2009) ("In determining whether an interspousal conveyance is bona fide, *Manhart* requires an examination into all the circumstances, including the reason for the conveyance, the relationship and condition of the parties, and their subsequent use of the property[.]").

[67] *See, e.g., Manhart*, 725 P.2d at 1240 ("Whether the property remains the separate property of the spouse to whom it was conveyed, depends on how the spouses treat the property. If they jointly use and manage the property, then it may be considered 'jointly acquired.' *See,*

of the Oklahoma Statutes *creates* a marital interest in property.  It simply provides for an equitable proceeding, whereby the state court will recognize interests in property as they *actually exist* between divorcing parties.  This Court looks to federal bankruptcy law to determine the extent to which a debtor's interest in property is property of the estate.[68]  The Court finds that Defendant holds an equitable and beneficial interest in the Residence and Vehicles for the reasons stated above (namely, that he retained management and control in circumstances that showed he owned the property in all but legal title), and does not rely on the fact that a state court *may* later use its statutory authority to reclassify the property.

Plaintiff has met his burden under § 727(a)(2)(A).  Defendant shall be denied a discharge pursuant to that section.

### Section 727(a)(4)(A)

Section 727(a)(4)(A) of the Code provides that a discharge may be denied where the debtor "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account[.]"[69] The United States Court of Appeals for the First Circuit has held that

> the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest

---

*Hardin v. Hardin*, 182 Okl. 229, 77 P.2d 721 (1938). The controlling facts in such cases are the time of the conveyance in relation to the separation of the spouses, and the completeness of their separation, especially in regard to their dealings concerning the conveyed property."); *Bartlett v. Bartlett*, 144 P.3d 173, 178 (Okla. Civ. App. 2006) ("*Manhart* indicated that the conveyance to one spouse may, but does not necessarily, alter the status of marital property.").

[68]   *Parks v. FIA Card Servs., N.A. (In re Marshall)*, 550 F.3d 1251, 1255 (10th Cir. 2008) (citing *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1197 (10th Cir. 2002)).

[69]   § 727(a)(4)(A).

based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.[70]

The Fourth Circuit has held that

[i]n order to be denied a discharge under this section [§727(a)(4)(A)], the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud. The false oath made by the debtor must have related to a material matter. Whether a debtor has made a false oath within the meaning of § 727(a)(4)(A) is a question of fact.[71]

A statement contained in a debtor's schedules or statement of affairs, or the omission of assets from the same may constitute a false oath for purposes of § 727(a)(4)(A).[72] Omitted information has been deemed material where it "concern[s] the existence and disposition" of a debtor's property.[73] Because the debtor is usually the only person able to testify directly concerning intent, "fraudulent intent may be deduced from the facts and circumstances of a case."[74]  The United States Court of

---

[70]  *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987) (citations omitted).

[71]  *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987) (citations omitted). *See also Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294 (10th Cir. 1997) ("In order to deny a debtor's discharge pursuant to this provision [§ 727(a)(4)(A)], a creditor must demonstrate by a preponderance of the evidence that the debtor knowingly and fraudulently made an oath and that the oath relates to a material fact.").

[72]  *See Job v. Calder (In re Calder)*, 907 F.2d 953, 955 (10th Cir. 1990).

[73]  *Id.* (citing *In re Chalik*, 748 F.2d 616, 618 (11th Cir. 1984)).

[74]  *Id.* at 955–56.  Although not directly on point, the Court has found helpful certain cases dealing with revocation of discharge for failure to disclose assets under § 727(d)(2).  The United States Court of Appeals for the Seventh Circuit has held that

[t]o find the requisite degree of fraudulent intent, the court must find the debtor knowingly intended to defraud the trustee, or engaged in such reckless behavior as to justify the finding of fraud.  The trustee may prove the debtor's fraud by evidence of the debtor's awareness of the omitted asset and by showing that the debtor knew that failure to list the asset could seriously mislead the trustee or that

Appeals for the Tenth Circuit has provided further guidance in the application of § 727(a)(4)(A), holding that "[a] debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence."[75]  We have also been instructed that "an honest error or mere inaccuracy is not a proper basis for denial of discharge."[76]  On the other hand, a debtor may not escape a denial of discharge under § 727(a)(4)(A) by asserting that the omitted information concerned assets he or she believed to be exempt or worthless.[77]  While Oklahoma law provides a generous homestead exemption for most debtors in bankruptcy, Defendant's conviction under federal securities laws would likely have resulted in a severe limitation of that exemption.[78]

For the reasons stated above, the Court finds that Defendant had an equitable interest in the Residence and Vehicles that should have been disclosed in his bankruptcy papers.[79]  Failure to do

---

the debtor acted so recklessly in not reporting the asset that fraud is implied.  The bankruptcy court's finding of fraudulent intent may be based on inferences drawn from a course of conduct.  Additionally, fraudulent intent may also be inferred from all of the surrounding circumstances.

*In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992) (citations omitted).  *See also Kaler v. Olmstead (In re Olmstead)*, 220 B.R. 986, 994 (Bankr. D.N.D. 1998) (quoting *Yonikus*); *Rezin v. Barr (In re Barr)*, 207 B.R. 168, 176 (Bankr. N.D. Ill. 1997) (fraud "may be proven by evidence that Debtors were aware the omitted assets existed and that they knew failure to list the assets would mislead creditors or the Trustee").

[75] *In re Brown*, 108 F.3d at 1294.

[76] *Id.* at 1295.

[77] *In re Calder*, 907 F.2d at 955 (citing *In re Chalik*, 748 F.2d 616 (11th Cir. 1984)).

[78] *See* § 522(q)(1).

[79] *U.S. Trustee v. Garland (In re Garland)*, 417 B.R. 805, 816 (10th Cir. BAP 2009) (*citing Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550 (5th Cir. 1987) and *R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes)*, 229 B.R. 253 (1st Cir. BAP 1999)), *aff'g* 385 B.R. 280 (Bankr. E.D. Okla. 2008).

so constitutes a false oath in connection with this case.[80]  Despite Defendant's protestations

otherwise, the Court finds that he fully understands the difference between nominal ownership and

equitable ownership.  His efforts to feign ignorance regarding his interest in property because he is

not a divorce attorney are unavailing.  Defendant is a sophisticated actor and used his interest in

property to his advantage when it suited him, and denied it when it did not.  To the extent Defendant

felt his interest had been completely forfeited prior to filing the petition, then it should have been

disclosed as a transfer of his interest.  Defendant's failure to schedule his interest in the Residence

and Vehicles was a knowing and fraudulent furtherance of his concealment of that interest in order

to prevent the United States and the Trustee from liquidating that interest for the benefit of

Defendant's creditors.  The Court concludes that Defendant shall also be denied a discharge pursuant

to § 727(a)(4)(A).

### Conclusion

The Court is mindful that objections to discharge should be construed liberally in favor of

debtors and strictly against objecting parties.  However, a bankruptcy discharge is a privilege

reserved for the honest debtor.  Plaintiff has met his burden by a preponderance of the evidence with

respect to Defendant.  Defendant has not presented sufficient evidence to overcome the inference

of fraudulent intent.  The discharge of Defendant should be denied under § 727(a)(2)(A) and (4)(A).

As a result, the Court need not consider Plaintiff's claims against Defendant under other sections

of § 727.

Defendant shall not be granted a discharge in Case No. 11-10045-M.  A separate judgment

---

[80]  *See Farmers Co-op. Ass'n of Talmage, Kan. v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982) ("The intentional and fraudulent omission of assets from the sworn Statement of Affairs or schedules can constitute both a concealment and a false oath[.]").

consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 31st day of March, 2014.

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6685.7